Good morning everyone and welcome to the Ninth Circuit. Judge Miller and I again want to welcome and thank Judge Pregerson for helping us out this week. Judge Pregerson is in the Central District of California and as I said, I believe it was yesterday, in my opinion, that is the busiest district in our circuit. So for him to make the time is truly appreciated. And on the Ninth Circuit, we could not get our work done without the help of people like Judge Pregerson. So thank you so much for taking the time. Really appreciate it. So today we have, and I'm assuming they're both nodding so they can both hear me, we have four cases on calendar today. Everyone has their argument times here. We'll go ahead and call the first matter, Owen v. Signal Mutual Indemnity Associated Limited. And we have counsel present and counsel you may proceed. May it please the court, counsel, Charles Rabinowitz for the petitioner, Troy Owen. The major issue in this case, the first issue in this case, is where a longshoreman retires involuntarily for valid reasons may the few jobs that he could still have performed as a longshoreman physically perform but are no longer available to him because of his retirement be the basis for determining his residual wage earning capacity. The trial judge stated that the answer is yes, even though he retired for sound financial reasons. The Benefits Review Board turned facts completely around and said he retired voluntarily. And if he retires voluntarily, whatever he gives up is his residual wage earning capacity. And the record is very well established that Troy Owen, the last thing he wanted to do was retire as a longshoreman. He had been a longshoreman for about 18 or 19 years. He absolutely loved the job. This is what he wanted to do for his lifetime. His grandfather had been a longshoreman. His father had been a longshoreman. This was his goal in life, was to become a longshoreman and eventually a walking boss. His benefits were very, very good. He made almost $114,000 in the 52 weeks before he was hurt. He had free health insurance for his wife and his family on top of that. He had excellent retirement benefits. He didn't want to give up this job, and he tried everything he possibly could to avoid retirement. After he was medically stationary and he could barely lift his right arm away from his body because of the injury, he consulted two other orthopedic shoulder specialists to see if they could improve the condition. And neither one could offer him anything. So then he was stuck with what he had. So he tried to get on a hiring board called the Straight Dock Job. The longshoreman referred to it as the old man's board because it's the easiest jobs and it's reserved for the older workers, 55 and older. And Mr. Strader, who was the expert for the plaintiff, whom the judge found extremely credible and knowledgeable, spearheaded that and tried to get it through the Joint Port Labor Relations Committee, and he couldn't do it. So the next thing Mr. Owen tried is he knew he couldn't pay his bills by going back to the waterfront and taking the few jobs that he could handle. So what he did is he went to the employer and he said, Look, I've got a substantial disability. I'm going to get at least $1,000 a week in disability benefits. Why don't you pay me the $1,000 and I can afford to go back to work, take the few jobs that I can handle, and maybe get on the walking bus, get in the walking bus local where I could make a lot of money, probably well over $150,000 a year doing that and have a minimal disability. Or maybe I could get into the Marine Clerk's Union. Maybe I can get on the Straight Dock Job when an opening comes up on it. He tried to do that and the employer said, No, we're not going to pay anything. And he was between a rock and a hard spot financially. His wife testified that they were looking at foreclosure on their home, repossession of their cars. They were in a financial bind and they had spent all their savings when he was on disability and getting less money than he was making as a longshoreman. And he had no choice except to retire. But when he retired, he couldn't take the casual walking bus jobs or any of the other jobs. He was stuck. And those jobs were no longer available to him. We may have a question from someone on the screen now. Mr. Vance, could I ask you to address our decision in Christie? Because as I read that decision, we said there that under 902.10, I guess it is, disability is defined in terms of incapacity because of injury. And whether you've retired or not, we said in Christie, is irrelevant to that analysis. So how do you reconcile your position with that case? Well, Christie was a different case. There the longshoreman had a job. I don't know if he was a longshoreman, but he was covered by the Longshore and Harbor Workers' Compensation Act. And he had a job that he was able to handle. But a retirement, a good retirement program came up. And he decided that if he didn't take it, he was not going to have it when he reached 62 or retirement age. So he took the retirement benefits. And then as his condition worsened and he was unable to work, even at the job he was at several years before, he applied for permanent total disability. And the Benefits Review Board held that because he had voluntarily retired, in other words, he could have stayed in that job except for the good retirement benefits that were packaged that was about to expire. So the Benefits Review Board had held that because you voluntarily retired, you have no loss of wage earning capacity several years later. And this court reversed that decision and said that even though you voluntarily retire, it doesn't preclude you from permanent total disability at a later date. This case, Mr. Owen. I understand that maybe you're about to get to this. I understand the factual distinction, but it seems like the reasoning that we employed there was that retirement is just a separate thing and doesn't factor into the analysis of whether you have an incapacity because of injury to earn the wages. And that's the reasoning that seems like maybe it's in tension with your position. So can you address that? I don't think Christie is really applicable. The longshoreman in Christie did voluntarily. He could have continued. And had he asked for permanent total disability from the date of his retirement, that would be the same issue that's in this particular case. But Mr. Owen wanted to continue. He did everything he possibly humanly could have to stay as a longshoreman. And when he retired, the jobs that he could perform were no longer available to him. That's the issue. The jobs have to be not only physically unsuitable, but they have to also be available. And in Christie, the job was still available to the longshoreman when he retired. But when Troy Owen retired, the jobs that he could perform were no longer available to him. They were no longer available, and physically he was very limited. All of them were not available? This is Judge Pragerson. All of them were not available to your client? Once he retired on the waterfront, he cannot go back and get a casual walking boss job or a marine clerk job. In other words, once you retire, you're out. It's not like the NBA or something, where you can retire and then two years later, if baseball isn't working out for you, you can come back and say, I'd like to go back and play a couple of more years. You can't do that on the waterfront, unfortunately. There's one other issue in this case that I just want to talk a little bit about. Can I ask one more question before you get to that? Under your view of how the statute works, suppose you could have two people, and suppose they suffer identical injuries, and one of them is like your client, who has a retirement package that makes it such that it makes financial sense for him to retire, and somebody else with less generous benefits, it doesn't make sense for him to retire. I guess you would say that the one who had to retire for financial reasons, he is disabled, and the other one is not totally disabled. Is that right, and if so, does that really make sense as a reading of the statute? I think when you look at whether a retirement is voluntary or involuntary, you have to look at all the circumstances involved. For example, if the employer in this case said to Mr. Owen, we'll pay you $1,000 a week as an advance on permanent partial disability if you try to go back to work and do the best you can, and he said, no, I'm not going to do it, that would be a voluntary decision on his part. But what's the compulsion that would require an employer to pay $1,000, for example? How can we fault the decision-making process if there's no compulsion by the employer to offer an accommodation like that? Well, the problem is that when they didn't offer it, financially he was between a rock and a hard spot. Worrying about foreclosure on your house and repossession of your cars and not being able to pay your heat bill and property taxes and that kind of thing puts a lot of pressure on people. And the trial judge felt that he retired for sound financial reasons. And, you know, if he had a million-dollar savings account or something, it would be a different story. But the testimony was that he had used up all of his savings to try to support himself when he was on disability and not making as much. So it's a little bit different. If I can get to the other point, I have it for about a minute. Yeah, go ahead. One of the things the judge found is that he could make more money than Mr. Strader felt he could make and Mr. Owen felt he could make because the judge found that he could handle all of the mechanical door-opener jobs for potash and soda ash. And the judge found that Mr. Strader had in-depth personal knowledge of the physical requirements of the specific longshore jobs. He had an intimate understanding of the longshore positions. But when Mr. Strader testified that he couldn't perform half of the door-opener jobs because the soda ash was too physical for him, the judge decided on his own that Mr. Strader was wrong. And he had no basis in the record for that. And when Mr. Strader said that 50% of the work was soda ash and 50% was potash and he couldn't handle 50% of the job, the judge felt that that was speculation. And it wasn't speculation because the PMA, the Pacific Maritime Association, did not keep track of soda ash and potash jobs. They kept track of job classifications and they didn't keep track of whether the cargo was involved with it or not. For example, they have records of how many hours Mr. Owen worked as a holdman. But they don't have records of what he did as a holdman on containers, steel coils, steel logs, bulk cargo like soda ash or potash. They just kept track of holdman. And the fact that they didn't have records doesn't mean that somebody who knows what's happening on the waterfront can't make a reasonable estimate of what the jobs were. Can I ask you a question? I understand that argument very well. And I'm just trying to understand the implications to your client of the judge's finding that on this issue, Mr. Strader, that his testimony was not accepted. What was the financial implication to your client of that finding? The financial implication was that the judge found that because of the judge's findings, he could work more than 800 hours a year. And 800 is an important tipping point for longshoremen because if they don't work 800 hours, they don't get vacation, they don't get holiday, they don't get retirement year. And that was a key thing. Right, but what did it mean to your client? That's my question. It means he got less in disability benefits. Well, I understand that. You can't quantify it, though, I guess, at this point. Well, we could. But Mr. Strader's testimony was that he would work under 700 hours a year, and the judge found with that job he would work slightly over 800 hours a year. If I can leave? Reserve? Excuse me? Would you like to reserve the rest of your time? I would. Thank you. We can go ahead and give him one, and we may end up giving him two, but one for now. Thank you. Thank you. May it please the Court. Scott Holloman for Temco and Signal Mutual. The petitioner raises two basic arguments in this case, the retirement issue and then this question about the mechanical hopper-opener jobs. And I'd like to address that second issue first because I think there's some confusion. There's been a suggestion that the ALJ found that Mr. Owen could do 100 percent of the mechanical hopper-opener jobs, and if you read the decision carefully, you'll see that the ALJ never found, as a factual matter, that Mr. Owen was capable of all of those jobs. Rather, he did find he was skeptical about the 50 percent estimate by Mr. Strader. So the question is, why did he include 100 percent of those hours in his overall calculation? So to address that, I think it's important to take a step back and remember that at this point in the ALJ's decision, he is coming up with an estimate of the claimant's retained wage earning capacity. And if you look at Section 8H of the Act, it says that the ALJ is charged with coming up with an amount that reasonably represents the injured worker's earning capacity. So it is an approximation. It's an estimate. Sorry to interrupt you, but going to that component, because I think it's really fundamental. When I look at this issue, let me ask you a very precise question. It's going to take a minute for me to recite it, but I think in my mind it's very important. The Benefits Review Board, like this court, is required to accept the ALJ's findings unless they are unsupported by substantial evidence. The ALJ heard testimony from Stuart Strader, who in the ALJ's own words, quote, is an experienced longshoreman who has worked in Portland since 2005 and is a business agent and member of the Labor Relations Committee for the local union. Strader testified as to Owens' physical ability to, quote, perform mechanical hopper opener jobs and opined that half of those jobs would not be a problem and the other half definitely would be a problem. There were no objections to this testimony or cross-examination on Strader's qualifications or experience. And just as a trial judge, you know, when an opposing counsel does not object and the party who could have objected doesn't object to that person's qualifications or ability to render such opinions, I just can't imagine a situation where without telling somebody from the bench that I have questions, that I would simply, I hate to use the word, sandbag or, you know, come out with an opinion by ambush but not raise that issue in open court. And that's what happens here. The ALJ explicitly found that Mr. Strader's knowledge of longshore employment was extensive. He performs the longshoreman jobs and sees the equipment used on a daily basis. And as a union representative, he has an intimate understanding of the positions. He provided detailed descriptions of those positions and thorough explanations for why Mr. Owens is or is not able to perform them. That's from the ALJ. And then, you know, the big but is the ALJ rejected Strader's estimate that Owens can do 50% of hopper opener jobs. And that I find inexplicable. The ALJ did not find Strader not credible in that regard. Rather, the ALJ stated by claimant's own admission, his Pacific Maritime Association records show no distinction between soda ash and potato ash jobs. And thus the percentage is not based on any data or factual information. And when you go back and you look at that breakdown of job descriptions, it's just generic. It doesn't tell you anything. And it's not Strader's, Stradler's, Stradler's records. It's just those are bookkeeping records. So, you know, I don't understand that reference and why that would be there to as a vehicle to to dispute the credibility of what was undisputed. And, you know, the ALJ talks about Owen making an admission, but I don't see any admission of any kind. There is no dispute that the PMA payroll records include one category for mechanical hopper opener jobs and no distinction between the soda ash and the potash. We've already talked about that. Furthermore, the fact that the payroll records don't distinguish between these jobs is not inconsistent with Stradler's testimony that Owen can only do half those jobs. In other words, the fact that the PMA mechanical hopper opener category is broad doesn't mean that Owen can do all the jobs in that category. And certainly not a basis, in my view, at least preliminarily to discount Stadler's testimony, which was done here. So, you know, I'm just sort of at a loss to understand how a judge can can without any notice to the parties on a fundamental issue where there's no dispute, no cross-examination, no objection as to lack of foundation, come up with an opinion that, you know, that discounts the testimony. That's my problem, just to be blunt. I understand. If I could try to clarify what I think is going on here, it's I don't think it's quite right that the judge completely discounted Mr. Strader's testimony. I think he did discount the number of hours that were put forward in the claimant's methodology for estimating earning capacity. But the way that he did that was that he said that in a countervailing there was a countervailing consideration and that basically the two different considerations canceled each other out. And this is on page 35 of the excerpts of record. So what this other consideration was, was that looking back in the 16 months prior to the injury, if you look back over that period, about 60 percent of the time Mr. Owen was working in more physically demanding jobs, holdman, lasher, and so forth. He cannot do those jobs anymore because of his injury. So the judge rationally inferred that that time, that amount of time, he could spend trying to do the less physically demanding jobs, the button pusher job and the mechanical hopper opener job. So that would tend to increase the number of hours that Mr. Owen could get for work and increase his earning capacity. So he essentially said that, yes, maybe it should be reduced some based on the factors you're mentioning, Mr. Claimant, but it should also be increased because of this countervailing consideration. And I think that those roughly cancel each other out. But the judge didn't, he didn't say that. All we know is he discounted without notice the testimony of Mr. Owens' key witness on a very significant issue. That's what we know. Well, I guess I would come back to the ultimate factual finding that he made that I think is on review before the court is that Mr. Owen was capable of earning about $600 a week. And we had put forward evidence that it was as high as $1,100 a week. And on the other hand, the claimant was arguing for something closer to $500 a week. And everyone put forward evidence and arguments that the judge discussed in his decision. Our evidence was after the. How do we review a record when what you're saying is it all came out in the wash? And the problem is, you know, we have to be able to review things on the basis of the findings that are made by a court. And what I've indicated to you is a finding on a specific, discreet, significant issue that seems to have been made in the way that I previously described. So I don't want to comment further on it. If I could just make one more point on that. If you look at this court's decision in Rhine versus SSA, which is cited in all the parties' briefs, the court was dealing with a very similar issue, which was under Section 10C, the ALJ is charged with coming up with an estimate of the worker's average weekly wage and earning capacity before the injury. And this court noted that it's not an exact formula. And essentially, he needs to be provided with flexibility to come up with what is an educated guess, really. And if it turns out that the guess is wrong, and I'm talking here about Section 8H, which is very similar, where he's coming up with an amount that reasonably represents the earning capacity going forward, if it turns out that that is wildly off, then either party can go back to the judge under Section 22 of the Act and seek modification. So I guess I just think that there's almost extra deference given to these kinds of estimates that the ALJ is charged with making. If I could turn to the other issue briefly, the essential problem with the petitioner's argument is that he is saying that he is making these jobs unavailable through a choice to retire. So even though he was capable of working in some jobs and earning money, he nevertheless thinks that he should be considered totally disabled based on his individual financial circumstances and his decision pursuant to those circumstances to withdraw from the labor market. The problem with that argument is that it doesn't square with the language of the statute, which talks about earning capacity. And as was noted, this Court in Christie equated earning capacity with the ability to earn wages. So in other words, what are you capable of earning? What can you earn? It's not a reflection of your preferences or your choices or the economic consequences of those choices. So I think that there's a lot of talk about the voluntary, involuntary nature of the retirement, but as this Court said in Christie, those words do not appear in the statute. And really, they are just sort of a shorthand way of – it looks like you have a question, Judge Miller. I'm sorry. No, I'm sorry. So really, if there's a question about the impact of these things, you need to go back to the language of the statute, which is talking about the incapacity because of injury to earn the same wages. And that has been interpreted, as this Court noted in Rhine, to when you're talking about capacity and what alternative employment is suitable, you don't consider the claimant's preferences or the unintended side effects of choices that they may make. In that case, the worker essentially said, I have some good reasons for not taking jobs that are available to me. And so therefore, those jobs should not be considered available and suitable, and I should be considered totally disabled. And this Court rejected that argument. I believe that they should do the same here, and I think that's my argument. And if there are any other questions, I'd be happy to address them. Okay. Thank you very much, sir. Thank you. We'll go with one minute. Thank you. I just want to spend a few minutes on the first argument, and the key issue is whether the retirement of Troy Owen was involuntary or voluntary. If he voluntarily retired and gave up the opportunity to take those few jobs he could handle on the waterfront, then that would be his wage-earning capacity. But the key word is voluntary or involuntary. And in this case, he did everything he possibly could to stay on the waterfront, try to get the walking boss jobs, the clerk jobs, and do whatever he could. And financially, he couldn't do it. He just was put in a bind. If he could have gotten a decision from the ALJ a year and a half earlier, he could have stayed on the waterfront. He could have gotten $1,048 a week and paid his bills, but he couldn't. Essentially, that's where he is. When it's an involuntary retirement, you're stuck. And this was as involuntary as it could possibly have been. One thing he would have loved is to have stayed on the waterfront and be able to continue working and fulfill his lifetime dream of becoming a walking boss. Can I ask a quick question? If you're unsuccessful on that issue, the second issue is not significant to you? The second issue is very significant. But if the court finds that he's entitled, the judge should have given him permanent total disability because those jobs were not available, the second issue becomes moot. But I think it's still important for this court to weigh in on this because the Benefits Review Board said essentially, not essentially, they said it exactly, that the judge can do whatever he wants to do. And that's true up to a point. But he has to anchor it, as the employers said, they have to anchor it in the evidence. And his finding that he could handle all of the mechanical door opener jobs, including the soda ash, is not anchored in the evidence. Thank you very much, counsel. Unless we have any further questions? No? Okay, great. Thank you very much, counsel. Thank you to both of you for your fine argument and briefing.  We'll move on to the next.
judges: OWENS, MILLER, Pregerson